UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| G. DAVID IVERSON and ACCESS WITH SUCCESS, INC., <br><br>   Plaintiffs <br> v. <br><br> CITY OF BOSTON, MASSACHUSETTS, <br><br>   Defendant | CIVIL ACTION NO.: 04-CV-11825-NMG |

## AFFIDAVIT OF G. DAVID IVERSON IN SUPPORT OF HIS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

On his oath, G. David Iverson, says and deposes as follows:

1. I am the plaintiff in this action. I reside at 130 Dartmouth Street, Apartment 905, Boston. The apartment complex is known as Tent City. It is across the street from the Back Bay MBTA station. I have resided in this complex for approximately 14 years. I have no plans to change my residence at this time.

2. In September 1987, at age 41, I was shot in a street attack in Boston's North End. The gunshot severed my spinal cord and left me with a T8-T9 complete paraplegia. I have used a wheelchair for ambulation for slightly more than 17 years as of this writing. I also suffer from chronic neuropathic pain secondary to paraplegia. I have what is known as a "tethered cord." It is a painful condition. I also have a hip that dislocates when my body is jarred or strains a certain way.

3. On a daily basis, whenever I use my wheelchair on streets and sidewalks in my neighborhood I constantly encounter obstacles that impair my ability to move safely and without serious pain.

1

4. Both eastern corners of Stuart and Dartmouth Streets do not meet the slope requirements of the ADAAGs. The curb cuts are steeper than they should, be because the City did not take into consideration the hilly section of the street, as it should have. They are much too steep. Therefore, they are dangerous for me to navigate in my wheelchair. When going down the slope, the foot rests of my wheelchair bottom out, which throws me forward and puts me in danger of falling out of my wheelchair and into traffic. When going up slope, I am in danger of tipping over backwards or not being able to make it up at all depending on the level of strength or pain that I have on that day.

5. The City could have avoided making this curb cut dangerous by having started it further back into the Dartmouth Street sidewalk and allowing it to slope more gradually toward the Stuart Street crosswalk.

6. Stuart and Dartmouth is a very busy and dangerous intersection. I have used the curb cut at this location more times than I can specifically recall, but I know for a fact that I have used it many, many times in the year prior to filing the present case and I intend to use it again. It is practically unavoidable for me. It is close to home and it is en route to many places that I travel to by wheelchair.

7. I have become better at negotiating the steep slope, but always feel that a slight mistake would put me in the path of an oncoming car, especially when I am going down slope into the crosswalk.

8. On the southeast side of this same intersection (Copley Plaza side) there is a curb cut made of brick. This curb cut has four or five bricks missing. The holes add to the danger involved in using this curb cut. If a wheel gets caught in a hole, I can be tipped out of my wheelchair. This curb cut is also practically unavoidable in my daily travels. I have used it many, many

times in the year prior to filing the present case and I intend to use it again. The bricks should be replaced or, better yet, the curb cut should not be made of bricks.

9. There is a similar steep curb cut on Clarendon Street where it intersects with the Mass. Pike exit or entrance.

10. I frequently travel by wheelchair on the aforementioned curb cuts. They are practically unavoidable for me if I want to get around in my neighborhood.

11. I frequently travel in my wheelchair on both sidewalks of Dartmouth Street between Stuart Street and Tremont Street. On the east side, the sidewalk is made of brick from 131 Dartmouth Street all the way to Tremont Street. I had been appointed by the Mayor's office to a citizen's advisory committee as a representative of my neighborhood before the construction of the building, 131 Dartmouth Street, began. In 2001, I attended meetings chaired by the Boston Redevelopment Authority. I voiced my objections to having brick sidewalks because of the danger and difficulty (and pain for me) presented by the cracks, holes and undulations commonly found in brick sidewalks. It is very difficult for people in wheelchairs or elderly who have mobility impairments to navigate brick sidewalks. Also, people who are visually-impaired and use a tactile cane have difficulty when the cane gets stuck in a crack. I suggested that the sidewalk could be part concrete and part brick as it is on the western side of Dartmouth Street. When the City replaced the sidewalk after construction at 131 Dartmouth Street, I (along with a group of neighbors) objected to the placement of a brick sidewalk. The BRA ignored my suggestion. I do not know why.

12. In addition to causing me to have severe pain every time I hit a bump or a hole, the uneven and cracked brick surface is difficult for me to navigate in my wheelchair. This eastern sidewalk of

Dartmouth Street is one that I use almost daily. It is on the route of travel to many places that I frequent, including theaters and restaurants on Tremont Street.

13. In front of the MBTA station on Dartmouth Street, there are large and deep cracks that run the width of the sidewalk. These are virtually impossible to navigate in a wheelchair. Again, I have encountered these cracks almost daily and will continue to encounter them on a daily basis, unless they are repaired.

14. There is a curb cut on each of the four corners at the intersection of Dartmouth Street and Columbus Avenue. Three out of the four are made incorrectly such that water puddles deeply at the base of the curb cut for a number of days after rain or snow, sometimes for as long as three days.

15. Furthermore, in my experience, the curb cuts on Dartmouth Street from Boylston Street to Tremont Street are rarely, if ever, shoveled after a snowstorm. This is not unique to Dartmouth Street alone. This happens throughout the City at numerous curb cuts. Many times I could not even cross Dartmouth Street to the Back Bay MBTA station because the curb cuts on both sides were not shoveled. I have personally observed and experience the effects of curb cuts packed with snow.

16. Warren Avenue in the South End has an undulating, cracked concrete sidewalk on the north side between Clarendon Street and Dartmouth Street. This is virtually impossible for me to navigate, but I use this sidewalk often as a path of travel to the Boston Center for the Arts and neighborhood restaurants that I patronize. This type of cracked and heaving sidewalk can be found in many places throughout the City of Boston.

17. All along Tremont Street in the South End there are numerous curb cuts that puddle. There is one curb cut across the street from a restaurant called Aquitaine (on the west side) that puddles very deeply and consistently for days after precipitation.

18. Whenever I have to move through a puddle at the base of a curb cut my feet get wet and my hands get soaked. The water is often putrid and dirty in the summer. This gets on my hands and clothes. I experienced this problem as recently as November 16, 2004, which was three days after a rainstorm.

19. The City has a terrible shortage of handicapped designated parking spaces. There is only one handicapped parking spot on Tremont Street from Berkeley Street all the way to Reggie Lewis Center. There are numerous restaurants and four theaters on this stretch of Tremont Street that I patronize. I cannot drive to and park on the street near these places, unlike people who do not have wheelchairs.

20. On Tremont Street at Clarendon Street, there is a manhole cover in the middle of the curb cut. The wheels of my wheelchair hit the manhole cover whenever I go up or down the curb cut and I have to be very careful to keep myself in balance. If I am not careful, the manhole cover will cause my chair to bounce or tip over.

21. I was a plaintiff in another ADA case in this Court several years ago involving a restaurant on Tremont Street. I do not recall the name of the restaurant or the name of the defendant. I do recall, however, that the judge in that case wrote an opinion suggesting that the City should designate disabled accessible parking spaces along Tremont Street. The City never did this. I have spoken directly with Steve Spinetto of the Mayor's Commission for Persons with Disabilities about this particular parking issue (and many other access issues throughout the City) and, in fact, met with Mr. Spinetto and my attorney on Columbus Avenue (at a federal

judge's written suggestion) to have three disabled parking spaces located on Columbus Avenue, but nothing has been done to correct the shortage of disabled parking on Columbus Avenue, as well as Tremont Street. Mr. Spinetto has publicly stated that he has access GIS map of all the disabled parking spaces in the City. I would very much like to see this.

22. On the Congress Street side of City Hall (across from Quincy Market) there is a cobblestone sidewalk with curb cuts on each side. I cannot use the curb cuts because the cobblestone sidewalk defeats the purpose of the curb cuts. When I come to sections of cobblestone like this one, I have to roll my wheelchair out into the roadway.

23. Many of the few designated disabled parking spaces throughout the City are located next to trees or signs or newspaper boxes on the sidewalks. At this time, I can think of one in particular at the Boston Public Library, but there are others like it throughout the City. Again, the purpose of the accessibility feature is defeated by its surroundings. I cannot get out of my van on the sidewalk side of these spaces because there is a tree or a lamppost or some other obstacle in the way. If I want to use such a space, I have to ask a passerby to remove my chair and bring it to the moving traffic side.

24. I have personally encountered a lack of accessible curb cuts along Stuart Street and along Kneeland Street. Stuart and Kneeland are the same street, but the name changes at the intersection of Washington Street. Along this stretch of sidewalk, there are many cracks and uneven surfaces that make it difficult and dangerous for me to use my wheelchair. This hinders my access to the Theater District, along with the fact that through the entire Theater District there are only six on-street handicapped accessible parking spaces.

25. From Massachusetts Avenue heading west along Columbus Avenue, there are no handicapped accessible parking spaces. I have personally been unable to park along Columbus Avenue in order to patronize stores and businesses along this thoroughfare.

26. In the past year and in the year prior to filing the Complaint in this case, I have personally encountered all of the impediments and obstacles to wheelchair access described in this Affidavit.

27. More than once in the past year, on a nice summer night, I have traveled by wheelchair from my home on Dartmouth Street to Fenway Park to see a Red Sox game. One of the reasons why I travel by wheelchair is that there are few designated wheelchair accessible parking spaces around Fenway Park. The spaces on Landsdowne Street limit parking to one hour before the game and two hours after the game. At least this was the case three years ago, which was the last time I tried to park there. This does not allow a disabled person who parks on the street in the area time for socializing or eating out after a game in the same way that a non-disabled person could. Furthermore, there are no disabled parking spaces in any of the garages or private parking lots in the Fenway area. There are no on-street disabled spaces around Jillian's and the nightclubs on Landsdowne Street, nor on Brookline Avenue toward the Fenway movie theater. There is no on-street handicapped parking at the complex where the old Sears Building was. I have been unable to park in the area on more than one occasion in the past year.

28. The shortest route from Dartmouth Street to Fenway Park takes me along Boylston Street and Ipswich Street, which runs parallel to the Mass. Pike. There are no accessible curb cuts along this section of Boylston Street, nor on Ipswich Street, which forces me to travel along the side

of the road and face the risk of being hit by a car. I intend to travel by wheelchair to Fenway Park again next season.

29. This is a part of the reason why I live in Boston. It is known as a "walking city," which means there are interesting and entertaining places and people to see within short distances. People in wheelchairs cannot enjoy this benefit of living in Boston as much as people who walk.

30. At the Boston Public Library, I have encountered numerous obstacles to access. The doors at the main entrance are heavy and difficult to open. There are no accessible counters for checking out books. There are no accessible counters for returning books. There are no accessible counters for checking out or returning CD's or DVD's. The counters are too high. I am referring to the Johnson Building section of the Library. Further, the brick sidewalks in front of the Library are difficult to traverse in a wheelchair. If one visits the administrative office on the third floor (as I have) there is a sign that says, "Welcome to the Office of the President," but the service desk below the sign is too high to be accessible to a person in a wheelchair.

31. Six or seven years ago, I met personally with the President of the Library, Mr. Curley, to point out that the Library is, in many respects, not in compliance with the ADA. Mr. Curley told me that the City did not have the funds to renovate the Library, but if it did, the old section would be renovated, not the new section. Many things have been done to improve wheelchair access, in the old building, but in my experience, many things remain to be corrected by the City. There are wheelchair lifts that are tiny, claustrophobic compartments. The door of the compartment closes when it is in use and if the lift gets stuck, no one would be able to see you. There are alarms, but they would not work if the lift stops because of a loss of power.

32. In the lavatory facilities in the basement of the Library I have personally experienced (within the past year) difficulty in reaching soap dishes and electric hand dryers. They are placed beyond the reach of a person in a wheelchair.

33. There are computer terminals (with internet access) placed up on counters at the Library. Patrons stand at the counters to use the computers. I did not see any computer in a position accessible to a person in a wheelchair. There might be one that I do not know about or did not see. I would like to be able to use a computer at the Library.

34. I go to the Boston Public Library frequently and intend to return. For example, I went there on November 29, 2004 to return some DVD's.

35. There are only a few wheelchair accessible parking spaces in front of the Library, but it appears that the same cars occupy those same spaces for around eight hours nearly everyday, which leads me to think that the cars probably belong to people who work in the area. It would be reasonable, I believe, to add a few more spaces to accommodate Library patrons who use wheelchairs and to designate such spaces with time limits of 2 or 3 hours, so that a person could spend a few hours at the Library without tying up a parking space all day.

36. From 1992 to 2002, I would try to attend the various festivities of First Night in Boston. I would always have a party with a group of people at my home on New Year's Eve, some of whom would be able to attend the parade. I was not able to join them because it was impossible to get close enough to Boylston Street in my wheelchair to see the parade. There are no designated areas for wheelchair access at the First Night Parade.

37. I have experienced the same difficulty in Boston in trying to watch the Boston Marathon. I attended the Marathon with my family beginning at age 11. Since I became disabled in 1987, I have been unable to do this. I tried to attend the Marathon in 1988, but there was no place for

me to get close enough in my wheelchair to watch the race. I have tried to get to a spot on Boylston Street early on race day, but to no avail, because the crowds were too deep and too unruly for me to get through in my wheelchair and there is no designated area for wheelchair access. The last time I tried to attend the Marathon would have been in 1998 or 1999. I would like to be able to see it in person again, but I feel that it would be futile to try.

38. From the year I got out of the service in 1971, I always watched the Marathon at or near the finish line. In 1975, when I moved into Boston, I lived only a few blocks from the finish line and continued watching at the finish line. I miss the opportunity to enjoy this event. I feel it has been part of my lifelong culture. I think it is wrong that the Boston Marathon has wheelchair competitors, but no reasonable accommodation in Boston for spectators in wheelchairs.

39. I have been attending free outdoor concerts at the grass plot in front of Trinity Church in the summer over the past five or six summers. Last year, the City designated a wheelchair accessible area, but it was impossible to see the event from the designated area. As soon as anyone stood up, which people often do at outdoor concerts, my view was totally obstructed.

40. I also enjoy going to concerts on the Esplanade at the Hatch Shell. I have gone to blues concerts there for at least the past four or five years. I went to the WBOS Earth Day Concert on April 24, 2004. (I remember that was the day when some speakers fell from the stage and injured 11 people).

41. The designated wheelchair accessible viewing area has become smaller each year. It used to be about fifty feet wide. At the Earth Day Concert, it had been reduced to about twelve feet. The designated area was off to the right of the stage and it was a set of rows (columns really) in a vertical or lengthwise orientation toward the stage. Instead of allowing patrons in

wheelchairs to sit side by side in a row parallel to the stage, we had to sit behind one another in a narrow column.

42. There was a person in an electric wheelchair in front of me. I could not see the stage. Electric wheelchairs are higher than the manual wheelchair I use. Furthermore, in this seating arrangement it is difficult for people in wheelchairs to be accompanied by friends, companions or aides, because now there is only dust and asphalt in the designated seating are. There is no grass at all. Dust and mud can cause the mechanical parts of a wheelchair to deteriorate rapidly.

43. It would be safer and more reasonable in my opinion to designate the wheelchair accessible area in the middle in front of the stage in a row. People in wheelchairs do not stand up at concerts, so we tend not to block other peoples' views. People in wheelchairs generally do not shove others at concerts and get rowdy.

44. The number of disabled parking spaces for these events at the Hatch Shell also has decreased over the past few years. The spaces are situated along Storrow Drive, but west of the Hatch Shell and west of a driveway that functions as the only curb cut. Exiting one's car along Storrow Drive and traveling along Storrow Drive in traffic toward the accessible driveway can be incredibly dangerous. I have done it and it is frightening. There is an area nearby with no grass nearby used for parking by officials and VIP's. It would be much safer and more reasonable to designate disabled parking spaces in that area.

45. On a daily basis, as a person in a wheelchair, I encounter physical obstacles to my equal enjoyment of the services and programs offered by the City of Boston. In this Affidavit, I have related the ones that are foremost on my mind at this time. I think it is not possible to be exhaustive without making a formal survey of the City's handicapped accessibility features or

lack thereof. I am sure that I have had many other experiences and observations of this kind in the past year, perhaps too many to recount in a brief time. Therefore, I wish to reserve my right to supplement this Affidavit if necessary.

46. I would like to invite the Mayor and Mr. Spinetto to take a tour with me of the aforementioned area in this Affidavit. They could use one of my spare wheelchairs if they would like to experience first hand all of the above-described items.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 3rd DAY OF DECEMBER, 2004.**

/s/G. David Iverson
G. David Iverson

### CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail pursuant to Fed. R. Civ. P. 5.

/s/ Nicholas S. Guerrera
Nicholas S. Guerrera

Dated: 12/6/04

lack thereof. I am sure that I have had many other experiences and observations of this kind in the past year, perhaps too many to recount in a brief time. Therefore, I wish to reserve my right to supplement this Affidavit if necessary.

46. I would like to invite the Mayor and Mr. Spinetto to take a tour with me of the aforementioned area in this Affidavit. They could use one of my spare wheelchairs if they would like to experience first hand all of the above-described items.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 3rd DAY OF DECEMBER, 2004.

*/s/ G. David Iverson*
G. David Iverson

### CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail pursuant to Fed. R. Civ. P. 5.

*/s/ Nicholas S. Guerrera*
Nicholas S. Guerrera

Dated:    12/6/04